[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-15234
_____

D.C. Docket No. 4:15-cv-00103-JRH-GRS


JAMEKA K. EVANS,

Plaintiff-Appellant,

versus

GEORGIA REGIONAL HOSPITAL,
CHARLES MOSS, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(March 10, 2017)


Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and
MARTINEZ, [*] District Judge.

_____

[*] Honorable Jose E. Martinez, United States District Judge for the Southern District of Florida,
sitting by designation.

MARTINEZ, District Judge:

Jameka Evans appeals the *sua sponte* dismissal of her employment discrimination complaint, filed pursuant to 42 U.S.C. § 2000e *et seq*., in which she alleged that she was discriminated against because of her sexual orientation and gender non-conformity, and retaliated against after she lodged a complaint with her employer's human resources department.  We have carefully reviewed the Appellant's and amicus curiae's initial and supplemental briefs,[1] and have had the benefit of oral argument. For the reasons set forth below, we affirm the district court's dismissal order in part, and vacate and remand in part.

I.

Evans filed a *pro se* complaint against Georgia Regional Hospital ("Hospital"), Chief Charles Moss, Lisa Clark, and Senior Human Resources Manager Jamekia Powers, alleging employment discrimination under Title VII in her job as a security officer at the Hospital.  Evans also moved for leave to proceed *in forma pauperis* before the district court, and for appointment of counsel.  In her complaint, Evans alleged the following facts, which this Court accepts as true.[2]

---

[1]  This appeal arises from Evans's decision to proceed *in forma pauperis*, and the district court reviewed the allegations without appellees receiving service.  28 U.S.C. § 1915(e)(2)(B)(ii).  Appellees did not file a brief for this Court's consideration or otherwise appear on appeal, apart from informing the Court via letter that the district court dismissed the action before service was perfected on them.

[2]  *Hughes v. Lott*, 350 F.3d 1157, 1159-60 (11th Cir. 2003).

Evans worked at the Hospital as a security officer from August 1, 2012, to October 11, 2013, when she left voluntarily.  During her time at the Hospital, she was denied equal pay or work, harassed, and physically assaulted or battered. She was discriminated against on the basis of her sex and targeted for termination for failing to carry herself in a "traditional woman[ly] manner."  Although she is a gay woman, she did not broadcast her sexuality.  However, it was "evident" that she identified with the male gender, because of how she presented herself—"(male uniform, low male haircut, shoes, etc.").

Evans had not met Powers before the harassment began and had never discussed her sexual preference with her.  Yet, Evans was punished because her status as a gay female did not comport with Moss's gender stereotypes and this caused her to experience a hostile work environment.  For example, a less qualified individual was appointed to be her direct supervisor.  Moreover, internal e-mails provided evidence that Moss was trying to terminate Evans by making her employment unbearable, because she had too much information about his wrongdoing in the security department.

Evans also explained that her employers had violated some regulations or policies and that she had initiated an investigation.  After Evans lodged her complaints about these violations, Powers asked Evans about her sexuality, causing Evans and "others" to infer that her sexuality was the basis of her

harassment and that upper management had discussed it during the investigation. Finally, Evans provided that she was harassed and retaliated against because she spoke to human resources about Moss's discriminatory behavior.   Evans also reserved the right to amend her complaint should new information arise.

Evans attached to her complaint a "Record of Incidents."  This report stated that Moss had repeatedly closed a door on Evans in a rude manner, that she experienced scheduling issues and a shift change, and that a less qualified individual was promoted as her supervisor.  She detailed the problems she had with her new supervisor, Corporal Shanika Johnson, and asserted that Johnson scrutinized and harassed her.  Evans also asserted that someone had tampered with her equipment, including her radio, clip, and shoulder microphone.

Evans also included an e-mail from Harvey Sanchez Pegues, which stated that Moss had harassed Pegues on a daily basis, had a habit of favoritism, changed Pegues's schedule frequently, had created a tense and unpleasant work environment, and had a habit of targeting people for termination.  Evans also attached a letter from Jalisia Bedgard, which stated that Johnson and Moss had expected Evans to quit because of Johnson's promotion and, if not, because of a bad shift change that would cause Evans scheduling conflicts.  Another attached letter from Cheryl Sanders, Employee Relations Coordinator in the human resources department at the Hospital, indicated that the Hospital had investigated

Evans's complaints of favoritism, inconsistent and unfair practices, and inappropriate conduct, and had found no evidence that she had been singled out and targeted for termination. Finally, Evans attached e-mail correspondence between Pegues and Evans, which indicated that: (1) Pegues believed that Moss was trying to target Evans for termination because she had substantial evidence of wrongdoing against him, and (2) Moss had changed the qualifications of a job to prevent other candidates from qualifying.

A magistrate judge subsequently issued a report and recommendation ("R&R"), wherein the magistrate judge granted Evans leave to proceed *in forma pauperis*, denied her request for appointment of counsel, and *sua sponte* screened her complaint, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii). The magistrate judge preliminarily noted that that while the Equal Employment Opportunity Commission ("EEOC") had not indicated that there was an untimeliness issue, Evans reportedly worked at the Hospital from August 2012 through October 2013, and thus, only had 180 days from the alleged discriminatory conduct to file. The magistrate judge also noted that Evans's complaint in the district court needed to be consistent with her EEOC complaint. With respect to Evans's claim of discrimination based on her sexual orientation, or status as a gay female, the magistrate judge reasoned that—based on case law from all circuits that had addressed the issue—Title VII "was not intended to cover discrimination against

homosexuals."  With regard to Evans's claim of discrimination based on gender non-conformity, the magistrate judge concluded that it was "just another way to claim discrimination based on sexual orientation," no matter how it was otherwise characterized.  Additionally, the magistrate judge recommended dismissal of the retaliation claim on the basis that Evans failed to allege that she opposed an unlawful employment practice, given that sexual orientation was not protected under Title VII.  Additionally, the R&R noted that Moss, Clark, and Powers were coworkers or supervisors sued in their individual capacities and, therefore, were not actionable defendants under Title VII.   Finally, the magistrate judge recommended dismissing all of Evans's claims, with prejudice, without allowing her to leave to amend, because she pled no actionable claim nor seemed likely to be able to do so.

Evans timely objected to the R&R.  In particular, Evans argued that her gender non-conformity and sexual orientation discrimination claims were actionable under Title VII as sex-based discrimination.  She also argued that, as a *pro se* litigant, she should have been permitted to amend her complaint, stating that "new supplemental evidence ha[d] arisen that affirm[ed] the consistency of the claims alleged in [her] complaint with the claims investigated in the EEOC charge, satisfying the administrative consistency doctrine," and noting that she had reserved her right to amend in her complaint.

The Lambda Legal Defense and Education Fund, Inc., ("Lambda Legal") requested permission to file an *amicus curiae* brief in support of Evans's objections to the R&R, which the district court granted. Lambda Legal argued that an employee's status as lesbian, gay, bisexual or transgender ("LGBT"), does not defeat a claim based on gender non-conformity. Lambda Legal also disputed the magistrate judge's assertion that sexual orientation is not an actionable basis under Title VII, and disputed the assertion that all other courts have held so. Lambda Legal also argued that Evans did not need to plead a *prima facie* case to survive dismissal at the pleading stage. It also disputed the magistrate judge's recommendation that Evans's retaliation claim be dismissed with prejudice, arguing that Evans did not need to actually engage in protected activity to state a claim for retaliation so long as her belief that sexual orientation was covered by Title VII was not unreasonable. Lambda Legal also argued that the magistrate judge's remarks that Evans's claims were untimely and that her complaint was inconsistent with the EEOC investigation were "speculati[ve]" and "premature at best." Lastly, it argued that Evans was entitled to leave to amend, because any necessary amendment would not be futile given Evans's colorable claims.

The district court conducted a *de novo* review of the entire record and adopted—without further comment—the R&R, dismissed the case with prejudice, and appointed counsel from Lambda Legal to represent Evans on appeal.

7

On appeal, Evans, with the support of the EEOC as amicus curiae, argues that the district court erred in dismissing her claim that she was discriminated against for failing to conform to gender stereotypes, because an LGBT person may properly bring a separate discrimination claim for gender non-conformity in this Circuit.  Evans also argues that, contrary to the district court's assertion, sexual orientation discrimination is, in fact, sex discrimination under Title VII.  Evans further argues that the district court erred in concluding that she did not meet the requirements to bring a retaliation claim, because a plaintiff can establish a *prima facie* case of unlawful retaliation if there is a good faith, reasonable belief that the employer was acting unlawfully.  Finally, Evans argues that the district court erred in failing to allow her leave to amend her complaint, because *pro se* litigants should be allowed to amend their complaints when they have a viable argument. We address each argument in turn.

## II.

We review *de novo* a district court's *sua sponte* dismissal for failure to state a claim under 28 U.S.C. § 1915(e)(2)(B)(ii), viewing the allegations in the complaint as true.  *Hughes v. Lott*, 350 F.3d 1157, 1159-60 (11th Cir. 2003). Dismissal under § 1915(e)(2)(B)(ii) is governed by the same standard as a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997).  However, "[p]ro se pleadings are

held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. United States*, 148 F.3d 1262, 1263 (11th Cir. 1998). Moreover, we may affirm on any ground supported by the record, regardless of whether that ground was relied on or considered below. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, which, accepted as true, states a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible on its face when there is a "reasonable inference that the defendant is liable for the misconduct alleged." *Id*. A Title VII complaint need not allege facts sufficient to make out a classic *prima facie* case, but must simply provide enough factual matter to plausibly suggest intentional discrimination. *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015).

## III.

First, Evans argues that the district court erred in dismissing her claim that she was discriminated against for failing to conform to gender stereotypes, because an LGBT person may bring a separate discrimination claim for gender non-conformity.[3] She contends that her status as a lesbian supports her claim of sex

---

[3] Evans also briefly mentions that the district court erred in speculating about the timeliness of her EEOC charge and whether the allegations in her complaint were sufficiently

9

discrimination, because discrimination against someone for her orientation often

coincides with discrimination for gender non-conformity.  Evans further asserts

that discrimination based on gender stereotypes is a broad claim that encompasses

more than just her appearance, but also provides for suits based on various other

stereotypes, such as family structure.

Even though we hold, *infra*, that discrimination based on gender non-

conformity is actionable, Evans's *pro se* complaint nevertheless failed to plead

facts sufficient to create a plausible inference that she suffered discrimination.  *See*

*Surtain*, 789 F.3d at 1246.  In other words, Evans did not provide enough factual

matter to plausibly suggest that her decision to present herself in a masculine

manner led to the alleged adverse employment actions.  *Id.*  Therefore, while a

dismissal of Evan's gender non-conformity claim would have been appropriate on

this basis, these circumstances entitle Evans an opportunity to amend her

complaint one time unless doing so would be futile.

When "a more carefully drafted complaint might state a claim, a plaintiff

must be given at least one chance to amend the complaint before the district court

dismisses the action with prejudice."  *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th

Cir. 2001) (citation omitted).  Although a *pro se* litigant generally should be

---

similar to the EEOC's investigation.  However, Evans provided only a passing reference to these
issues, and no real argument to them.  Therefore, as a passing reference is insufficient to preserve
an issue on appeal, we consider these issues abandoned.  *See Greenbriar, Ltd. v. City of*
*Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

permitted to amend her complaint, a district court need not allow amendment when it would be futile. *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007). "Leave to amend a complaint is futile when the complaint as amended would still be properly dismissed or be immediately subject to summary judgment for the defendant." *Id.*

Here, Evans, a *pro se* litigant, has not previously amended her complaint, and it cannot be said that any attempt to amend would be futile with respect to her gender non-conformity claim and possibly others. *See Bryant*, 252 F.3d at 1163; *Sparks*, 510 F.3d at 1310. Discrimination based on failure to conform to a gender stereotype is sex-based discrimination. *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) (c*iting Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *superseded* by statute on other grounds, 42 U.S.C. § 2000e-5(g)(2)(B) (1991), *as stated in Landgraf v. USI Film Prods.*, 511 U.S. 244, 251 (1994)). Specifically, in *Glenn*, we held that discrimination against a transgender individual because of gender-nonconformity was sex discrimination. 663 F.3d at 1317 (applying gender-nonconformity sex discrimination in a 42 U.S.C. § 1983 action). In that decision, we stated that "[a]ll persons, whether transgender or not, are protected from discrimination on the basis of gender stereotype," and we reasoned that, because those protections apply to everyone, a transgender individual could not be excluded. *Id*. at 1318-19. We hold that the lower court erred because a gender

non-conformity claim is not "just another way to claim discrimination based on sexual orientation," but instead, constitutes a separate, distinct avenue for relief under Title VII.

Accordingly, we vacate the portion of the district court's order dismissing Evans's gender non-conformity claim with prejudice and remand with instructions to grant Evans leave to amend such claim.

IV.

Evans next argues that she has stated a claim under Title VII by alleging that she endured workplace discrimination because of her sexual orientation.  She has not.  Our binding precedent forecloses such an action.  *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979)[4] ("Discharge for homosexuality is not prohibited by Title VII . . . .").  "Under our prior precedent rule, we are bound to follow a binding precedent in this Circuit unless and until it is overruled by this court en banc or by the Supreme Court."  *Offshore of the Palm Beaches, Inc. v. Lynch*, 741 F.3d 1251, 1256 (11th Cir. 2014) (internal quotations omitted).

The EEOC argues that the statement in *Blum* regarding discharge for homosexuality is dicta and not binding precedent.  We disagree.  Before making such statement, the panel in *Blum* remarked: "We comment briefly on the other

---

[4]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

issues *raised on appeal*." 597 F.2d at 938 (emphasis added).  As a result, the

statement in *Blum* concerning the viability of a sexual orientation claim was not

dicta, but rather directly addressed a question before the Court.  Even if *Blum* is

read as disposing of the sexual orientation claim for another reason,[5] an alternative

reason does not render as dicta this Court's holding that there is no sexual

orientation action under Title VII.

In *Hitchcock v. Sec'y, Florida Dep't of Corr.*, 745 F.3d 476 (11th Cir. 2014),

this Court addressed whether an alternative holding is dicta:

> [A]n alternative holding is not dicta but instead is binding
> precedent.  *See, e.g., Massachusetts v. United States,* 333
> U.S. 611, 623, 68 S. Ct. 747, 754, 92 L. Ed. 968 (1948)
> (explaining that where a case has "been decided on either
> of two independent grounds" and "rested as much upon
> the one determination as the other," the "adjudication is
> effective for both"); *Richmond Screw Anchor Co. v.
> United States,* 275 U.S. 331, 340, 48 S. Ct. 194, 196, 72
> L. Ed. 303 (1928) ("It does not make a reason given for a
> conclusion in a case obiter dictum, because it is only one

---

[5]  The Court in *Blum* stated, in pertinent part:

> It is questionable whether appellant has presented a prima facie
> Title VII case of racial, sexual, or religious discrimination.
> However, even if he has done so, Gulf articulated a legitimate
> reason for his discharge: Mr. Blum admitted using Gulf's
> telephones for his own business. From what Gulf then knew of
> appellant's use as opposed to his later explanations and
> qualifications it had a legitimate reason for terminating him.
> Although he has attempted to show that this reason was a pretext,
> he has not shown that anyone in authority was aware that other
> employees used Gulf telephones for non-Gulf business.

597 F.2d at 937–38 (internal citations omitted).

of two reasons for the same conclusion."); *United States v. Title Ins. & Trust Co.,* 265 U.S. 472, 486, 44 S. Ct. 621, 623, 68 L. Ed. 1110 (1924) ("[W]here there are two grounds, upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter, but each is the judgment of the court, and of equal validity with the other.") (quotation marks omitted); *Bravo v. United States,* 532 F.3d 1154, 1162 (11th Cir. 2008) (explaining that an "alternative holding counts because in this circuit additional or alternative holdings are not dicta, but instead are as binding as solitary holdings"); *Johnson v. DeSoto Cnty. Bd. of Comm'rs,* 72 F.3d 1556, 1562 (11th Cir. 1996) ("[W]e are bound by alternative holdings."); *McLellan v. Miss. Power & Light Co.,* 545 F.2d 919, 925 n.21 (5th Cir. 1977) (en banc) ("It has long been settled that all alternative rationales for a given result have precedential value.").

745 F.3d at 484 n.3.  Applying this well-established law, the statement from *Blum* regarding a sexual orientation claim is not dicta, but rather binding precedent.

Evans and the EEOC also argue that the Supreme Court decisions in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998), support a cause of action for sexual orientation discrimination under Title VII.  Again, we disagree.  The fact that claims for gender non-conformity and same-sex discrimination can be brought pursuant to Title VII does not permit us to depart from *Blum*.  *See Randall v. Scott*, 610 F.3d 701, 707 (11th Cir. 2010) ("While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point." (citation omitted)); *N.L.R.B. v. Datapoint Corp.*, 642

14

F.2d 123, 129 (5th Cir. 1981) ("Without a clearly contrary opinion of the Supreme

Court or of this court sitting en banc, we cannot overrule a decision of a prior panel

of this court . . . ."). *Price Waterhouse* and *Oncale* are neither clearly on point nor

contrary to *Blum*. These Supreme Court decisions do not squarely address whether

sexual orientation discrimination is prohibited by Title VII.

Finally, even though they disagree with the decisions, Evans and the EEOC

acknowledge that other circuits have held that sexual orientation discrimination is

not actionable under Title VII. *See, e.g.*, *Higgins v. New Balance Athletic Shoe,

Inc.*, 194 F.3d 252, 259 (1st Cir. 1999) ("Title VII does not proscribe harassment

simply because of sexual orientation."); *Simonton v. Runyon*, 232 F.3d 33, 36 (2d

Cir. 2000) ("Simonton has alleged that he was discriminated against not because he

was a man, but because of his sexual orientation. Such a claim remains non-

cognizable under Title VII."); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d

257, 261 (3d Cir. 2001) ("Title VII does not prohibit discrimination based on

sexual orientation."); *Wrightson v. Pizza Hut of Am.*, 99 F.3d 138, 143 (4th Cir.

1996), *abrogated on other grounds by Oncale v. Sundowner Offshore Servs.*, 523

U.S. 75 (1998) ("Title VII does not afford a cause of action for discrimination

based upon sexual orientation . . . ."); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757,

762 (6th Cir. 2006) ("[S]exual orientation is not a prohibited basis for

discriminatory acts under Title VII."); *Hamner v. St. Vincent Hosp. & Health Care*

*Ctr., Inc.*, 224 F.3d 701, 704 (7th Cir. 2000) ("[H]arassment based solely upon a

person's sexual preference or orientation (and not on one's sex) is not an unlawful

employment practice under Title VII."); *Williamson v. A.G. Edwards & Sons, Inc.*,

876 F.2d 69, 70 (8th Cir. 1989) ("Title VII does not prohibit discrimination against

homosexuals."); *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1063-64 (9th

Cir. 2002) ("[A]n employee's sexual orientation is irrelevant for purposes of Title

VII. It neither provides nor precludes a cause of action for sexual harassment. That

the harasser is, or may be, motivated by hostility based on sexual orientation is

similarly irrelevant, and neither provides nor precludes a cause of action.");

*Medina v. Income Support Div.,* 413 F.3d 1131, 1135 (10th Cir. 2005) ("Title VII's

protections, however, do not extend to harassment due to a person's sexuality . . . .

Congress has repeatedly rejected legislation that would have extended Title VII to

cover sexual orientation.") (internal quotations omitted).  Evans and the EEOC

question these decisions, in part, because of *Price Waterhouse* and *Oncale*.

Whether those Supreme Court cases impact other circuit's decisions, many of

which were decided after *Price Waterhouse* and *Oncale*, does not change our

analysis that *Blum* is binding precedent that has not been overruled by a clearly

contrary opinion of the Supreme Court or of this Court sitting en banc.

Accordingly, we affirm the portion of the district court's order dismissing Evan's

sexual orientation claim.

16

V.

Evans also argues that the district court erred in concluding that she did not

meet the requirements for a retaliation claim, because a plaintiff can establish a

*prima facie* case of unlawful retaliation if there was a good faith, reasonable belief

that the employer was acting unlawfully.

However, we will generally not review a magistrate judge's findings or

recommendations if a party failed to object to those recommendations below.  *See*

11th Cir. R. 3-1.  Title 28 of the United States Code, Section 636(b)(1) provides

that, within 14 days of being served with a copy of a magistrate judge's

recommendations or findings, a party may file written objections with the court,

and the court shall conduct a *de novo* review of the issues raised.  28 U.S.C.

§ 636(b)(1).  Pursuant to 11th Cir. R. 3-1, a party who fails to object to a

magistrate judge's findings or recommendations in an R&R "waives the right to

challenge on appeal the district court's order based on unobjected-to factual and

legal conclusions," provided the party was given proper notice of the objection

time period and the consequences of failing to do so, as was the case here.

Consequently, we will only review a waived objection, for plain error, if necessary

in the interests of justice.  *Id*.  Review for plain error "rarely applies in civil cases."

*Ledford v. Peeples*, 657 F.3d 1222, 1258 (11th Cir. 2011).  Even when it does, we

require a greater showing of error than in criminal appeals. *United States v. Levy*,

391 F.3d 1327, 1343 n.12 (11th Cir. 2004).  We find nothing in the record that

suggests that plain error review is appropriate in this appeal.

Further, we do not consider an *amicus curiae* to be a party in the case where

it appears.  *See In re Bayshore Ford Truck Sales, Inc.*, 471 F.3d 1233, 1249 n.34

(11th Cir. 2006).  Moreover, without "exceptional circumstances, *amici curiae*

may not expand the scope of an appeal to implicate issues not presented by the

parties to the district court." *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240,

1247 (11th Cir. 1991) (regarding issues raised on appeal by *amici curiae* that were

not raised in the appellant's brief on appeal).

Here, Evans failed to object to the district court's dismissal of her retaliation

claim.  While Evans specifically objected to the dismissal of her claims for

discrimination based on gender non-conformity and sexual orientation, as well as

the magistrate judge's denial of her request for leave to amend her complaint,

notably absent from her filing was any mention of her retaliation claim.

Additionally, although an *amicus curiae* brief was filed by Lambda Legal, which

included an objection on this matter, Lambda Legal was not a party to the

litigation, or Evans's counsel at the time, and thus could not preserve that objection

for her.  *See Bayshore*, 471 F.3d at 1249 n.34.  For these reasons, we consider any

challenge to the district court's treatment of Evan's retaliation claim waived.  11th

Cir. R. 3-1.

For the foregoing reasons, the district court's order dismissing Evans's action with prejudice is affirmed in part, and vacated in part and remanded for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART AND REMANDED.**

WILLIAM PRYOR, Circuit Judge, concurring:

I concur in the majority opinion, but I write separately to explain the error of the argument of the Equal Employment Opportunity Commission and the dissent that a person who experiences discrimination because of sexual orientation necessarily experiences discrimination for deviating from gender stereotypes. Although a person who experiences the former will sometimes also experience the latter, the two concepts are legally distinct. And the insistence otherwise by the Commission and the dissent relies on false stereotypes of gay individuals. I also write separately to explain that the dissent would create a new form of relief based on status that runs counter to binding precedent and would undermine the relationship between the doctrine of gender nonconformity and the enumerated classes protected by Title VII.

The majority opinion correctly holds that a claim of discrimination for failure to conform to a gender stereotype is not "just another way to claim discrimination based on sexual orientation." Maj. Op. at 12. Like any other woman, Evans can state a claim that she experienced, for example, discrimination for wearing a "male haircut" if she includes enough factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Glenn v. Brumby*, 663 F.3d 1312, 1314, 1320–1321 (11th Cir. 2011). But just as a woman cannot recover under Title VII when she is fired because of her heterosexuality, neither can a gay woman sue

for discrimination based on her sexual orientation. Deviation from a particular

gender stereotype may correlate disproportionately with a particular sexual

orientation, and plaintiffs who allege discrimination on the basis of gender

nonconformity will often also have experienced discrimination because of sexual

orientation. *See, e.g.*, *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 287, 289, 291

(3d Cir. 2009) (Hardiman, J.) (holding that Title VII protects a gay man for

deviating from gender stereotypes but not for his sexual orientation). But under

Title VII, we ask only whether the individual experienced discrimination for

deviating from a gender stereotype. *Cf. id.* at 291.

The unsurprising reality that some individuals who have experienced

discrimination because of sexual orientation will also have experienced

discrimination because of gender nonconformity by no means establishes that

*every* gay individual who experiences discrimination because of sexual orientation

has a "triable case of gender stereotyping discrimination." *Id.* at 292. The

Commission and the dissent would have us hold that sexual orientation

discrimination always constitutes discrimination for gender nonconformity. They

contend, for example, that all gay individuals necessarily engage in the same

behavior. *E.g.*, Amicus Br. at 14 ("[A]ll homosexuals, by definition, fail to

conform to traditional gender norms *in their sexual practices*." (quoting *Vickers v.*

*Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006))) (alteration in original)

21

(emphasis added); Dissenting Op. at 40–41 (same); Amicus Br. at 15 (arguing that the stereotype exists that "'real' men should *date* women, and not other men" (quoting *Centola v. Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002))) (emphasis added). But that argument stereotypes all gay individuals in the same way that the Commission and the dissent allege that the Hospital stereotyped Evans.

By assuming that all gay individuals behave the same way or have the same interests, the Commission and the dissent disregard the diversity of experiences of gay individuals. Some gay individuals adopt what various commentators have referred to as the gay "social identity" but experience a variety of sexual desires. *E.g.*, E.J. Graff, *What's Wrong with Choosing to Be Gay?*, The Nation (Feb. 3, 2014) (recounting experiences of gay individuals); *see also* Brandon Ambrosino, *I Wasn't Born This Way. I Choose to Be Gay*, The New Republic (Jan. 28, 2014) (arguing against the belief that "none of us has any control over our sexual identities"). Like some heterosexuals, some gay individuals may choose not to marry or date at all or may choose a celibate lifestyle. And other gay individuals choose to enter mixed-orientation marriages. *See, e.g.*, Brief of Amici Curiae Same-Sex Attracted Men and Their Wives in Support of Respondents and Affirmance at 2–3, *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) (Nos. 14–556, 14–562, 14–571, 14–574). A gay individual may establish with enough factual evidence that she experienced sex discrimination because her behavior deviated

from a gender stereotype held by an employer, but our review of that claim would rest on behavior alone.

The dissent asserts that discrimination on the basis of sexual orientation "clearly violates Title VII," Dissenting Op. at 30, yet as the majority opinion explains, every circuit to have reviewed this issue, including our own, has arrived at the opposite conclusion, Maj. Op. at 15–16. The dissent compares gay females to heterosexual males, Dissenting Op. at 37 n.4, but it does not follow that an employer who treats one differently from the other does so "because of . . . sex" instead of "because of sexual orientation." The dissent also crafts a new, status-based class of protection that betrays a misreading of *Price Waterhouse* and *Glenn* and would undercut the relationship between the doctrine of gender nonconformity and the classes enumerated in Title VII.

The dissent misreads our precedent by framing the pertinent question in an appeal involving the doctrine of gender nonconformity as whether an employee's *status* deviated from the ideal held by an employer as to what a woman "should be." Dissenting Op. at 34–35. Not shy about this invention, the dissent repeats it on nearly every page. *Id.* at 29, 31–32, 35–42, 44–52, 55. But *Price Waterhouse* and *Glenn* concerned claims that an employee's *behavior*, not status alone, deviated from a gender stereotype held by an employer.

23

The dissent derives much of its analytic framework from legal commentary, Dissenting Op. at 31, but even that commentary accepts that *Price Waterhouse* concerned behavior, not status, and that current doctrine does not protect on the basis of status alone. Zachary R. Herz, Note, *Price's Progress: Sex Stereotyping and Its Potential for Antidiscrimination Law*, 124 Yale L.J. 396, 406–07, 433 (2014) (stating that the stereotype the plaintiff in *Price Waterhouse* deviated from was not "*behaving* as a woman 'should'" and that the "basic problem" today is that "employers are evaluating employees . . . according to discriminatory ideas about how men and women should *behave*" (emphases added)); *id.* at 432 (acknowledging that "the current regime . . . protects stereotypically "gay" *conduct* without protecting LGBT *status*" (emphases added)). The only possible "status" in *Price Waterhouse* was the employee's status as an "aggressive" woman. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989). But it is overbroad to say, as the dissent does, that *Price Waterhouse* asked about "status" in general when the decision clearly pertained to behavior.

The dissent also asserts that we provided Glenn relief "solely for *being* transsexual," which the dissent proclaims deviated from what the employer thought Glenn "should be," Dissenting Op. at 38 (emphasis added), but we did not afford relief based on status alone. Instead, Glenn's claim was successful because Glenn was fired after choosing to "beg[i]n to take steps to transition." Glenn

24

"present[ed]" and "dressed as a woman" at work and notified the supervisor that Glenn intended to continue this behavior. Because Glenn "was born a biological male," Glenn's employer believed these choices were "unsettling," "unnatural," and "not appropriate." *Glenn*, 663 F.3d at 1314, 1320–21. Title VII would have protected any biological male under those facts, not because of status, but because of behavior.

The dissent's revision of the doctrine of gender nonconformity from a behavior-based inquiry into a status-based one does more than misread precedent; it also does violence to the relationship between the doctrine and the enumerated classes of Title VII. The dissent would have us hold that "discrimination because an employee is gay violates Title VII[]" automatically under the doctrine. Dissenting Op. at 36. But *Price Waterhouse* is clear that gender nonconformity does not "inevitably" lead to protection. 490 U.S. at 251. The doctrine of gender nonconformity is not an independent vehicle for relief; it is instead a proxy a plaintiff uses to help support her argument that an employer discriminated on the basis of the enumerated sex category by holding males and females to different standards of behavior.

Because a claim of gender nonconformity is a behavior-based claim, not a status-based claim, a plaintiff still "must show that the employer actually relied on her gender in making its decision." *Id.* That is, the employer must additionally

25

establish that discrimination occurred on the basis of an enumerated class in Title VII. Remarks based on gender nonconformity are only "*evidence* that gender played a part" in the employer's decision and are not always determinative. *Id.* For example, under Title VII, an employee could fire a male who wore a dress to work—even if that violated the employer's gender stereotypes—if the reason for the firing was that all employees were required to wear a uniform that included pants. *See id.* at 252. The doctrine of gender nonconformity is, and always has been, behavior based. Status-based protections must stem from a separate doctrine or directly from the text of Title VII. The dissent's contrary view would undermine the evidentiary approach established by *Price Waterhouse* and the relationship of that doctrine to the text of Title VII.

The willingness to accept that *Price Waterhouse* and *Glenn* deal only with behaviors that deviate from gender stereotypes does not put one "at war with *Glenn*." Dissenting Op. at 37. Instead, it acknowledges that the doctrine of gender nonconformity is not and cannot be an independent vehicle for relief because the only status-based classes that provide relief are those enumerated within Title VII. We review claims of gender nonconformity the same way in all appeals regardless of a plaintiff's sexual orientation. Any correlation that might exist between a particular sexual orientation and deviation from a particular gender stereotype does not overcome this settled rule.

Because Congress has not made sexual orientation a protected class, the appropriate venue for pressing the argument raised by the Commission and the dissent is before Congress, not this Court. And for decades, members of Congress have introduced bills for that purpose. *See, e.g.*, Equality Act, H.R. 3185, 114th Cong. (2015); Employment Non-Discrimination Act, S. 815, 113th Cong. (2013), S. 811, 112th Cong. (2011), S. 1584, 111th Cong. (2009), H.R. 3685, 110th Cong. (2007), H.R. 3285, 108th Cong. (2003), S. 1284, 107th Cong. (2002), H.R. 2355, 106th Cong. (1999), H.R. 1858, 105th Cong. (1997), S. 2056, 104th Cong. (1996), H.R. 4636, 103d Cong. (1994); Civil Rights Act, H.R. 431, 103d Cong. (1993); Civil Rights Amendments Act, H.R. 423, 103d Cong. (1993), S. 574, 102d Cong. (1991); S. 430, 98th. Cong. (1983); S. 1708, 97th Cong. (1981); S. 2081, 96th Cong. (1979). Contrary to the dissent's assertions, Dissenting Op. at 52, we cite this pattern of legislation not because it does or can suggest legislative intent but because it illustrates that Congress is the appropriate branch in which to raise the arguments raised by the dissent. The dissent's disagreement boils down to incredulity that "[i]t cannot possibly be the case that" the combination of the text of Title VII and *Price Waterhouse* leave some individuals unprotected from discrimination. Dissenting Op. at 42. But as a Court, "[o]ur province is to decide what the law is, not to declare what it should be. . . . If the law is wrong, it ought to

be changed; but the power for that is not with us." *Minor v. Happersett*, 88 U.S.

162, 178 (1874).

ROSENBAUM, Circuit Judge, concurring in part and dissenting in part:

A woman should be a "woman."  She should wear dresses, be subservient to men, and be sexually attracted to only men.  If she doesn't conform to this view of what a woman should be, an employer has every right to fire her.

That was the law in 1963—before Congress enacted Title VII of the Civil Rights Act of 1964.  But that is not the law now.  And the rule that Title VII precludes discrimination on the basis of every stereotype of what a woman supposedly should be—including each of those stated above—has existed since the Supreme Court issued *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *superseded in part by* The Civil Rights Act of 1991, Tit. I, § 107(a), 105 Stat. 1075 (codified at 42 U.S.C. § 2000e–2(m)), 28 years ago.

Yet even today the panel ignores this clear mandate.  To justify its position, the panel invokes 38-year-old precedent—issued ten years before *Price Waterhouse* necessarily abrogated it—and calls it binding precedent that ties our hands.  I respectfully disagree.

Plain and simple, when a woman alleges, as Evans has, that she has been discriminated against because she is a lesbian, she necessarily alleges that she has been discriminated against because she failed to conform to the employer's image of what women should be—specifically, that women should be sexually attracted

29

to men only.  And it is utter fiction to suggest that she was not discriminated against for failing to comport with her employer's stereotyped view of women.  That is discrimination "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1),  and it clearly violates Title VII under *Price Waterhouse*.

So I dissent from Part IV of the panel's opinion.  On remand, Evans should be allowed to amend her complaint to state such a claim.

## I.

In 1989 *Price Waterhouse* rocked the world of Title VII litigation.  Before *Price Waterhouse*, the Supreme Court had recognized only one type of discrimination rooted in stereotyping that Title VII prohibits: discrimination based on the employer's assumption that, merely by virtue of membership in a protected group, the plaintiff possesses an attribute or will act against the employer's desire, in conformity with a supposed stereotypical characteristic of the group.

So, for example, in the pre-*Price Waterhouse* days, the Supreme Court held that the employers' practices in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971), and *Los Angeles Department of Water & Power v. Manhart*, 435 U.S. 702 (1978), violated Title VII.[6]   In *Phillips*, the employer hired men with young children but not women with young children, based on the employer's gender-based stereotype that women with young children—unlike men with young

---

[6] In *Phillips*, the Court concluded that the policy violated Title VII to the extent that it did not fit the exception for bona fide occupational qualifications.

30

children—would be incapable of balancing their "family obligations" with their work obligations. *See* 400 U.S. at 544. Similarly, in *Manhart*, the employer had a policy that required women to contribute a greater percentage of their salary to a pension fund than men had to, based on the statistic that, as a general matter, women lived longer than men. *See* 435 U.S. at 705.

In these cases, the employer violated Title VII by ascribing certain characteristics to individual women—without considering whether any individual woman actually possessed the characteristics—based on the employer's stereotyping of women as a group. So the employer discriminated because it *assumed* that all members of the protected group *would conform to* an undesired characteristic of the employer's stereotyped perception of the group. At least one commentator has referred to this view of Title VII as prohibiting "ascriptive" stereotyping. Zachary R. Herz, *Price's Progress: Sex Stereotyping and Its Potential for Antidiscrimination Law*, 124 Yale L.J. 396, 405 (2014).

But *Price Waterhouse* substantially broadened the scope of actionable discriminatory stereotyping under Title VII. In that case, the Supreme Court for the first time recognized that discrimination because of an individual plaintiff's *failure to conform* to the discriminator's desired and stereotyped perception of how members of the individual's protected group should be or act—essentially the mirror image of ascriptive stereotyping—violated Title VII. This kind of

31

stereotyping has been called "prescriptive" stereotyping, presumably because discrimination occurs on the basis that an employee does not satisfy an employer's stereotyped prescription of what the employee of that protected group should be or how the employee should act.  Herz, *supra*, at 406-07.

To understand why *Price Waterhouse* was so revolutionary, we need to consider the facts of that case.  The accounting firm Price Waterhouse denied partnership to Ann Hopkins, a female senior manager, because, in the eyes of her employer, she had qualities that defied stereotypes of how women should look and act.  Among other criticisms, Price Waterhouse employees described Hopkins as "abrasive[,]" "brusque[,]" and "macho";  they also complained that she "over-compensated for being a woman" and that she should have "walk[ed] more femininely, talk[ed] more femininely, dress[ed] more femininely, w[orn] make-up, ha[d] her hair styled, and w[orn] jewelry."  *Price Waterhouse*, 490 U.S. at 234-35 (alterations added).

Hopkins's claim could not have qualified for relief under the ascriptive-stereotyping theory that prevailed before *Price Waterhouse* was decided:  Price Waterhouse had not declined to make Hopkins a partner because it assumed that Hopkins would act in conformance with a stereotyped "feminine" manner.  Just the opposite:  Price Waterhouse had passed over Hopkins for partner because it *insisted* that she should act in a stereotyped "feminine" manner, and she did not.

Despite the fact that Price Waterhouse had not ascriptively stereotyped Hopkins, the Supreme Court found that Price Waterhouse's actions violated Title VII. Describing Price Waterhouse's employees' comments as "show[ing] sex stereotyping at work," the Supreme Court held that Title VII prohibited an employer from "evaluat[ing] employees by assuming or insisting that they matched the stereotype associated with their group." *Id.* at 251. The second part of this statement—"or insisting that [employees] matched the stereotype associated with their group"—opened a whole new avenue for Title VII claims by substantially expanding Title VII's previously understood reach of precluding discrimination based on only the first half of the statement—"assuming . . . that [employees] matched the stereotype associated with their group."

Applying this broader understanding, the Supreme Court concluded, "In the specific context of sex stereotyping, an employer who acts on the basis of a belief that a woman cannot be aggressive, *or that she must not be*, has acted on the basis of gender." *Id.* at 250 (emphasis added). Because Price Waterhouse had allegedly discriminated against Hopkins for being, in its view, as a woman "must not be," the Court determined that Price Waterhouse's conduct fell within the bounds of Title VII.

Nor did *Price Waterhouse* leave any doubt about its scope. In its holding, the Court emphasized that, "[i]n forbidding employers to discriminate against

individuals because of their sex, Congress intended to strike at the *entire spectrum* of disparate treatment of men and women resulting from sex stereotypes." *Id.* at 251 (quoting *Manhart*, 435 U.S. at 707 n.13 (quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971))) (emphasis added).   The Supreme Court's message was plain: regardless of the kind of prescriptive stereotype of women that a particular woman failed to satisfy, no employer—and no court— could hold that against her.

We in the Eleventh Circuit heard the Supreme Court's message loud and clear.   In *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011), the employer fired Glenn, a transgender woman, because the employer learned that Glenn intended to proceed with gender transition.   *Id.* at 1313, 1320-21.   In fact, the employer testified that he terminated Glenn's employment "based on 'the sheer fact of the transition.'" *Id.* at 1320-21.

We relied on *Price Waterhouse*'s reasoning to find that the employer's testimony "provide[d] ample direct evidence . . . that [the employer] acted on the basis of Glenn's gender non-conformity."   *Id.* at 1321.   For this reason, we concluded that the employer had violated Title VII.[7]  *Id.* at 1321.   So we applied prescriptive-stereotyping theory to hold that discrimination against a transgender

---

[7] Although *Glenn* was decided under the Equal Protection Clause, Title VII's standard is easier to satisfy than the Equal Protection Clause's standard.  *See Glenn*, 663 F.3d at 1321.   In *Glenn*, we also recognized the cross-applicability of principles between Title VII and Equal Protection cases by relying extensively on the rationale of Title VII decisions, particularly *Price Waterhouse*.

employee merely because the employee fails to conform to the employer's view of what a member of the employee's birth-assigned sex should be violates Title VII.

We reached this conclusion despite noting that before *Price Waterhouse*, "several courts" had determined that Title VII offered no relief to transgender victims of sex discrimination. *Id.* at 1318 n.5. These pre-*Price Waterhouse* opinions had reasoned that discrimination against a transgender or transsexual person occurred "not because she is female, but because she is transsexual." *Id.* (quoting *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1087 (7th Cir. 1984)). That is the same position that the panel and Judge William Pryor's concurrence take today: by their reasoning, discrimination against a lesbian happens not because she is a woman, but because she is a lesbian, as though being sexually attracted to men only is somehow divorced from a prescriptive stereotype of women.

But that is precisely the reasoning that we—including Judge Pryor—rejected in *Glenn*. The pre-*Price Waterhouse* opinions that we concluded *Price Waterhouse* had abrogated applied only ascriptive-stereotyping theory. They found that the employer had not discriminated against the transsexual or transgender employee in violation of Title VII because the employer had not assumed that the employee would conform to what the employer viewed as an undesired characteristic of the employee's birth-assigned gender.

35

These courts did not consider prescriptive-stereotyping theory, so they failed to ask whether the employer discriminated against the transgender or transsexual employee because the employee failed to meet the employer's stereotype of what a person of the employee's birth-assigned gender should be.  As a result, these courts did not inquire into Title VII's full scope.  For this reason, we wholly dismissed the holdings of these other courts' opinions, concluding in the strongest of terms that *Price Waterhouse* had "eviscerated" them.  *Id.* (quoting *Smith v. City of Salem*, 378 F.3d 566, 573 (6th Cir. 2004)) (quotation marks omitted).

*Price Waterhouse* and *Glenn* likewise demand the conclusion that discrimination because an employee is gay violates Title VII's proscription on discrimination "because of . . . sex."  By definition, a gay employee is sexually attracted to members of her own sex.  *See Gay*, The American Heritage Dictionary (5th ed. 2011) ("Of, relating to, or having a sexual orientation to persons of the same sex.").  So when an employer discriminates against an employee solely because she is a lesbian, the employer acts against the employee only because she is sexually attracted to women, instead of being attracted to only men, like the employer prescriptively believes women should be.  This is no different than when an employer discriminates against an employee because she is an aggressive or "macho" woman or solely because she is a transgender woman.  In all cases, the employer discriminates against the employee because she does not

36

conform to the employer's prescriptive stereotype of what a person of that birth-assigned gender should be.[8]   And so the employer discriminates against the employee "because of . . . sex."[9]  42 U.S.C. § 2000e-2(a)(1).

## II.

Despite the fact that my colleague Judge William Pryor joined in all aspects of the *Glenn* opinion—including its discussion of why *Price Waterhouse* abrogated other courts' conclusions that Title VII does not protect transgender people from discrimination—today his concurrence takes a position at war with *Glenn*:  it asserts that an employer who discriminates against a woman employee solely because she is a lesbian and therefore fails to conform to the employer's prescriptive stereotype of what a woman should be does not violate Title VII's ban on sex-based prescriptive stereotyping.

To justify its contradictory conclusion, Judge Pryor's concurrence attempts to distinguish *Glenn* by ignoring its facts.   To be sure, as the concurrence

---

[8] I do not mean to suggest any judgments about the reasons for why an employer might hold any given prescriptive stereotype.  The reasons for it are irrelevant to whether prescriptive stereotyping actually occurs under Title VII.  All that matters is that the employer discriminates against the employee because the woman employee's sexual attraction to women fails to comport with the employer's view of what a woman should be.  *Cf. Manhart*, 435 U.S. at 707 (finding that discrimination based on even "unquestionably true" ascriptive stereotypes constitutes discrimination against an "individual" "because of . . . sex" and therefore violates Title VII).

[9] This type of discrimination is discrimination "because of . . . sex" for another reason as well.  When an employer discriminates against a woman because she is sexually attracted to women but does not discriminate against a man because he is sexually attracted to women, the employer treats women and men differently "because of . . . sex."

emphasizes, *see* W. Pryor Op. at 24-25, before Glenn's employer ended her employment, he disciplined her for dressing as a woman when she worked for him.

But the concurrence conveniently overlooks the fact that the employer did not fire Glenn for that.  Rather, Glenn's employer fired Glenn *before* her transition "because 'Glenn's *intended* gender transition was inappropriate . . . .'"  *Glenn*, 663 F.3d at 1314 (emphasis added).  He readily admitted that he terminated her "based on 'the *sheer fact* of the transition'" that she had not yet undertaken but had expressed an intent to undertake.[10]  *Glenn*, 663 F.3d at 1314, 1320-21 (emphasis). In other words, he fired her solely for being transsexual—that is, for failing to conform to her employer's view of what a birth-assigned male should be.  We said that was enough for Glenn to state a Title VII claim for discrimination based on her *termination*.  *Id.* at 1321.

And discrimination against an employee solely because she fails to conform to the employer's view that a woman should be sexually attracted to men only is no

---

[10] Judge Pryor's concurrence tries valiantly to escape this inconvenient fact, arguing that the employer's statement that he "fired Glenn because he considered it 'inappropriate' for her to appear at work dressed as a woman and that he found it 'unsettling' and 'unnatural' that Glenn would appear wearing women's clothing," *Glenn*, 663 F.3d at 1320, demonstrates that Glenn was not fired "solely for being transsexual."  W. Pryor Op. at 24.  This argument is wrong on three counts.  First, the opinion in *Glenn* reflects that Glenn actually wore women's clothing to work only once (on Halloween) *before* she was fired, and on that occasion, she was asked to leave—she was not terminated—so plainly, Glenn was not fired for actually having worn women's clothing to work.  Second, it is clear that the employer's statement on which the concurrence relies expressed concern only that Glenn would appear at work as a woman *after* her transition, but that never occurred since the employer fired her before her transition.  Finally, the employer candidly admitted that he fired Glenn "based on 'the *sheer* fact of the transition.'" *Glenn*, 663 F.3d at 1320-21 (emphasis added).

different than discrimination against a transsexual because she fails to conform to the employer's view that a birth-assigned male should have male anatomy.  In both cases, the employer discriminates because the employee does not comport with the employer's vision of what a member of that particular gender should be.  It's just as simple as that.

To avoid this obvious conclusion, the concurrence recharacterizes the discrimination that a lesbian experiences when her employer discriminates against her for failure to conform to the employer's view that women should not be sexually attracted to women; the concurrence says that this is discrimination based on sexual orientation, and sexual orientation is not a protected class under Title VII.  *See* Pryor Op. at 21, 27.  But the fact that such discrimination may be alternatively characterized does not make the employer's discrimination any less based on the employee's failure to conform to the employer's prescriptive gender stereotype.  Nor does it make the discrimination any less actionable under *Price Waterhouse*'s gender nonconformity theory.

If it did, Glenn's termination claim would have been dismissed.  But instead, we correctly found that Title VII did not allow Glenn's employer to fire her for failing to conform to the employer's prescriptive stereotype of what a birth-assigned male should be because doing so constituted discrimination "because of . . . sex."  Our conclusion did not change the fact that Glenn is transsexual, and Title

39

VII does not protect transsexuals as a class.  Rather, our conclusion was in spite of those facts.  *See Glenn*, 663 F.3d at 1318 n.5 (recognizing that pre-*Price Waterhouse* decisions had concluded that a claim based on discrimination against a transsexual woman for being transsexual was not actionable under Title VII because it stated a claim of discrimination "not because she is female, but because she is transsexual," and transsexuals are not a protected class under Title VII) (citations and quotation marks omitted).

As the concurrence itself notes, "[U]nder Title VII, we ask only whether the individual experienced discrimination for deviating from a gender stereotype." Pryor Op. at 21.  When the answer is "yes," the plaintiff has stated a claim, and the fact that Title VII does not protect homosexuals as a class is entirely irrelevant. The concurrence offers no answer to this hole in its reasoning.

Instead, it changes the subject, pointing to an artificial line between discrimination because an employee has not behaved in a way that the employer thinks a person of that gender should, on the one hand, and discrimination because an employee is not the way that the employer thinks a person of that gender should be, on the other.  Pryor Op. at 23.  As a matter of logic, no basis exists for this arbitrary line.  Even a circuit that has declined to apply gender-stereotyping to a plaintiff's claim that he was discriminated against because he is gay has essentially admitted as much:  in *Vickers v. Fairfield Medical Center*, 453 F.3d 757, 762 (6th

Cir. 2006), the Sixth Circuit expressed concern that recognizing the Title VII claim of a man who asserted that he was harassed and discriminated against because his co-workers perceived him to be gay would allow "any discrimination based on sexual orientation [to] be actionable under a [prescriptive] sex stereotyping theory . . . , *as all homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices*."  453 F.3d at 764 (emphasis added).

If an employer discriminates against a lesbian solely because she fails to conform to the employer's view that women should be sexually attracted to only men, the employer clearly discriminates against that woman for failure to conform to gender stereotypes as much as if the employer discriminates against a woman because she engages in the behavior of dating women.

But in the concurrence's world, only the person who acts on her feelings enjoys the protection of Title VII.  This makes no sense from a practical, textual, or doctrinal point of view.

As a practical matter, this construction protects women who act or dress in ways that the employer perceives as gay, because that behavior fails to conform to the employer's view of how a woman should act.  But it allows employers to freely fire women that the employer perceives to be lesbians—as long as the employer is smart enough to say only that it fired the employee because it thought that the employee was a lesbian, without identifying the basis for the employer's

conclusion that she was a lesbian.  It cannot possibly be the case that a lesbian who is private about her sexuality—or even a heterosexual woman who is mistakenly perceived by her employer to be a lesbian—can be discriminated against by the employer because she does not comport with the employer's view of what a woman should be, while the outwardly lesbian plaintiff enjoys Title VII protection.[11]

The concurrence's distinction between behavior and being also enjoys no textual support.  Title VII prohibits discrimination "because of . . . sex."  42 U.S.C. § 2000e-2(a)(1).  It doesn't distinguish between discrimination "because of . . . sex," based on behaving "like a woman," and discrimination "because of . . . sex" based on being a woman.  To take an analogous example, by prohibiting discrimination "because of . . . religion," Title VII does not allow an employer to

---

[11] The concurrence takes a phrase of this sentence out of context and uses it to mischaracterize this dissent as amounting to nothing more than a disagreement with Congress since Congress did not specifically intend to protect lesbians from discrimination on the basis that they are sexually attracted to women.  *See* W. Pryor Op. at 27.  But, in reality, the concurrence is the one with the disagreement—only it's a disagreement with the text of Title VII, Supreme Court precedent, our precedent, and even logic.  True, my conclusion—that discrimination against a lesbian because she fails to comport with the employer's view of what a woman should be violates Title VII's ban on discrimination "because of . . . sex"—likely is not what Congress had in mind when it enacted Title VII.  But "male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).  Yet the Supreme Court found that irrelevant to whether Title VII's text prohibited it.  So the mere fact that we may believe that Congress may not have specifically intended the meaning of what a statute actually says is not a basis for failing to apply the textual language.  This dissent relies on the text of Title VII, as well as Supreme Court precedent, this Court's opinion in *Glenn*, and logic, not on some "disagreement" with Congress.  Of course, the concurrence is free to ignore my analysis rather than respond to it, but that doesn't make it go away.

discriminate against a non-practicing Catholic for simply being a Catholic any more than it allows an employer to discriminate against a Catholic for coming to work on Ash Wednesday with a cross of ashes on her forehead.  The Title VII text that prohibits discrimination against a Catholic simply for being a Catholic is exactly the same as the Title VII text that prohibits discrimination against women, except that it refers to "religion" instead of "sex."  If that language does not permit an employer to discriminate against a Catholic for being Catholic, it does not allow an employer to discriminate against a woman for being a woman, regardless of whether she behaves the way her employer thinks a woman should.

The Supreme Court has likewise not found a distinction between behavior and being in applying Title VII's proscription of discrimination "because of . . . sex."  In the ascriptive-stereotyping case *Manhart*, which involved the policy charging women more than men for pension benefits, living longer was a matter of being rather than behaving.  But the Supreme Court found that the policy nonetheless violated Title VII, despite the fact that the plaintiffs were not discriminated against for their behavior.  And that's because Title VII's broad language "strike[s] at the *entire spectrum* of disparate treatment of men and women resulting from sex stereotypes."  *Price Waterhouse*, 490 U.S. at 251 (emphasis added) (citations and quotation marks omitted).

43

Finally, as a doctrinal matter, neither the concurrence nor any other source, to my knowledge, has satisfactorily explained how a woman who behaves in a manner that is inconsistent with the employer's vision of how a woman should act is discriminated against any more on the basis of her gender than a woman who is discriminated against because, by being sexually attracted to women, she fails to conform to the employer's view of what a woman should be.  The concurrence's distinction between "behavior" and "being" is a construct that is both illusory in its defiance of logic and artificial in its lack of a legal basis.

Perhaps because the dichotomy that the concurrence advocates cannot find logical support, the concurrence constrictively reads *Price Waterhouse* and reinvents *Glenn* to support its theory.  *See* Pryor Op. at 23-26.  While the concurrence correctly notes that Price Waterhouse did not promote Hopkins because she acted in a manner that did not conform to its view of women, nothing in *Price Waterhouse* purports to limit its reasoning to only those cases involving discrimination on the basis of behavior (as opposed to interests or attractions) that does not comport with the employer's prescriptive gender stereotype.[12]  True, Price

---

[12] The concurrence relies on Zachary Herz's legal commentary for the proposition that "current doctrine does not protect on the basis of status alone."  Pryor Op. at 24.  While Herz does note that "the current regime . . . protects stereotypically 'gay' conduct without protecting LGBT status," as the concurrence notes, *id*. at 5 (quoting Herz, *supra*, at 432), Herz was suggesting, among other things, that *Price Waterhouse* supports a broader reading than some courts at that time were giving it.  *See* Herz, *supra*, *e.g.*, at 399 ("a broader application of *Price Waterhouse*'s view of discrimination has the potential to resolve, or at least to ameliorate, a serious problem in American antidiscrimination law—the inability of traditional Title VII

Waterhouse discriminated against Hopkins based on characteristics Hopkins demonstrated in the workplace that were inconsistent with Price Waterhouse's prescriptive stereotype of women.  But that is simply how the facts in *Price Waterhouse* arose.  Nothing in *Price Waterhouse*'s reasoning or construction of Title VII justifies limiting *Price Waterhouse*'s holding to cases involving discrimination against women for their behavior, as opposed to discrimination against women for being women or for their interests and attractions.  Nor, for the reasons I have discussed, does it make sense to do so.  The concurrence likewise points to nothing in *Price Waterhouse* that so limits its reasoning.

As for *Glenn*, I have already explained how the concurrence tries to use this case as a do-over of that one.  But *Glenn* says what it says—namely, that discrimination solely because a birth-assigned male failed to conform to the employer's prescriptive stereotype for what men should be by being transsexual constitutes gender-based discrimination in violation of Title VII.  Whether the concurrence likes it or not—and whether the concurrence recognizes it or not—we are bound by *Glenn*, and *Glenn* cannot be reconciled with our holding today.

So the concurrence tries a different tack.  It argues essentially that it's for lesbian employees' own good that we should not recognize that Title VII prohibits

---

approaches to address the realities of modern workplace bias").  Since Herz's note was published, other cases have recognized the extent of *Price Waterhouse*'s reasoning.  *See*, *e.g.*, *Winstead v. Lafayette Cty. Bd. of Cty. Comm'rs*, --- F. Supp. 3d ----, No. 1:16CV00054-MW-GRJ, 2016 WL 3440601, at *5-9 (N.D. Fla. June 20, 2016).

discrimination against lesbians on the basis that they fail to conform to the employer's view of what a woman should be. *See* W. Pryor Op. at 20-21. In the concurrence's view, we shouldn't apply *Price Waterhouse*'s prescriptive-stereotyping theory to preclude discrimination against a lesbian for failure to comply with the employer's ideal view of women because doing so somehow "rel[ies] on false stereotypes of gay individuals." *Id.*

Judge Pryor's concurrence then embarks on an irrelevant journey through some of the different ways in which a gay person may express—or suppress—her sexual attraction. *See id.* at 3. It asserts, for example, that "[s]ome gay individuals adopt the gay 'social identity' but experience a variety of sexual desires. . . . [S]ome gay individuals may choose not to marry or date at all or may choose a celibate lifestyle. And other gay individuals choose to enter mixed-orientation marriages." *Id.* (citations omitted).

The concurrence's argument seems to fundamentally misunderstand what it means to be a lesbian. Lesbians are women who are sexually attracted to women. That's not a stereotype; it's a definition.

And if an employer discriminates against a woman for the reason that the employer believes the employee is sexually attracted to women, how the employee expresses—or suppresses—her feelings of sexual attraction is irrelevant to the fact that the employer has discriminated against the woman for failing to conform to

the employer's stereotype that women should be sexually attracted to only men.[13]
That discrimination violates Title VII's proscription against discrimination
"because of . . . sex," under *Price Waterhouse* and *Glenn*, just as much as if the
discrimination were for the failure of a woman to be demure or a birth-assigned
male to refrain from identifying as a woman.[14]

   The panel opinion's reasons for rejecting this conclusion fare no better than
Judge Pryor's concurrence's.  The panel opinion makes two arguments in defense
of its position.   First, the panel opinion asserts that, under our prior-panel-
precedent rule, we have no choice but to hold that discrimination against a woman
for being a lesbian and therefore failing to conform to her employer's stereotype of
what a woman should be does not violate Title VII.  And second, the panel opinion

---

[13] I nevertheless note that even under Judge Pryor's limited view, discrimination against an employee for "adopt[ing]" what Judge Pryor's concurrence describes as the "gay 'social identity,'" for marrying or dating someone of the same sex, for choosing not to marry or date at all, or for entering into so-called mixed-orientation marriages, is still discrimination in its own right because the employer holds a prescriptive stereotype that members of a given sex should not act in these ways.  Judge Pryor's concurrence may dress up the prescriptive stereotype that the employer applies however he wishes, but all of this discrimination is discrimination because of the employee's failure to conform with the employer's idealized version of what a member of a given sex should be.  So all of it violates Title VII under *Price Waterhouse* and *Glenn*.

[14] The concurrence seems to suggest that I am proposing that merely alleging that an employer has discriminated because an employee is a lesbian somehow suffices to prove the claim.  *See* W. Pryor Op. at 25-26 ("Because a claim of gender nonconformity is a behavior-based claim, not a status-based claim, a plaintiff still 'must show that the employer actually relied on her gender in making its decision.'").  To be clear, that is not what I am saying.  Of course, a plaintiff who alleges that her employer discriminated against her because she failed to conform to the employer's view that women should be sexually attracted to only men must prove that, in fact, that was a motivating factor in why her employer took adverse employment action against her.  She can do so through either direct or circumstantial evidence.  But at the pleading stage, all she must do is allege facts that, taken as true, establish that her employer discriminated against her because she did not comport with the employer's vision of what a woman should be.

contends that its holding is correct because "other circuits have held that sexual orientation discrimination is not actionable under Title VII."   Maj. Op. at 15. Neither argument can withstand scrutiny.

Beginning with the panel opinion's contention that our precedent dictates our result today, our prior-panel-precedent rule states that we must follow a prior panel's decision, even if we disagree with it—*unless* a later en banc or Supreme Court opinion overrules or undermines the prior precedent to the point of abrogation. *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998).   We have said that where a Supreme Court opinion "directly conflict[s] with" a prior precedent, the prior panel precedent has been abrogated. *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009).   Contrary to the panel opinion's position in Evans's case, the exception governs here.

The panel opinion hangs its hat on *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979), a case our predecessor court decided 38 years ago—ten years before the Supreme Court recognized prescriptive-stereotyping theory in *Price Waterhouse*.   In *Blum*, we said, "Discharge for homosexuality is not prohibited by Title VII . . . ."   *Id.* at 938.   This ruling allows an employer to discriminate against a woman solely because she is a lesbian and does not fulfill the employer's version of what a woman should be.

But that result "directly conflict[s] with" *Price Waterhouse*'s holding that Title VII prohibits an employer from discriminating against its employee on the basis that she fails to conform to the employer's view of what a woman should be. Indeed, *Price Waterhouse* "eviscerate[s]" *Blum*'s holding no less than we found it did other courts' pre-*Price Waterhouse* holdings that employers did not violate Title VII when they discriminated against their transgender employees simply because the employees failed to conform to the employers' view of what a member of the employee's birth-assigned sex should be. *See Glenn*, 663 F.3d at 1318 n.5 (quoting *Smith*, 378 F.3d at 573) (quotation marks omitted).

Simply put, *Price Waterhouse* requires us to apply the rule that "[a]n individual cannot be punished because of his or her perceived gender-nonconformity." *See id.* at 1319. Since continued application of *Blum* would allow a woman to be punished precisely because of her perceived gender non-conformity—in this case, sexual attraction to other women—*Price Waterhouse* undermines these cases to the point of abrogation. *See Kaley*, 579 F.3d at 1255; *Chambers*, 150 F.3d at 1326.

And even if it didn't—a position that is not supported by the reality of what *Blum*'s holding does—*Blum*'s failure to account for prescriptive-stereotyping

theory in its "analysis"[15] demands reexamination after *Price Waterhouse*.  For this reason, since the panel concludes that *Blum* continues to bind us even after *Price Waterhouse*, we should rehear this case en banc on this issue.  *Cf., e.g.*, *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, Ga.*, 831 F.3d 1342, 1348 (11th Cir. 2016) (encouraging appellants to "petition the court to reconsider our decision en banc" where prior precedent appeared to conflict with recent Supreme Court law).

Turning to the panel opinion's second basis for its holding, the opinion wrongly finds comfort in other circuits' rulings on this issue.  To be sure, we should carefully consider our sister circuits' opinions and the bases for them, for our colleagues are a thoughtful and learned bunch.  But to put it colloquially, the mere fact that our friends may jump off a bridge does not, in and of itself, make it a good idea for us to do so.

---

[15] In *Blum*, we actually engaged in no discussion or reasoning related to our statement, "Discharge for homosexuality is not prohibited by Title VII . . . ."  597 F.2d at 938.  Rather, we simply cited *Smith v. Liberty Mutual Insurance Co.*, 569 F.2d 325, 327 (5th Cir. 1978).  In *Smith*, we characterized the plaintiff as arguing that Title VII precludes discrimination "based on affectional or sexual preference."  *Id.* at 326.  Finding no cause of action for the plaintiff under Title VII, we explained our holding in ascriptive-stereotyping-theory terms:  "Here the claim is not that [the plaintiff] was discriminated against because he was a male, but because as a male, he was thought to have those attributes more generally characteristic of females and epitomized in the descriptive 'effeminate.'"  *Id.* at 327.  In other words, we found that Title VII could not assist the plaintiff because his employer did not assume that, since he was a man, he would comport with an undesired stereotype of men.  And although the plaintiff presented a prescriptive-stereotyping theory—that is, the theory that his employer discriminated against him under Title VII by insisting that the plaintiff comply with its view of what a man should be—we rejected it.  This is perhaps understandable, since the Supreme Court did not recognize the theory for another eleven years after we issued *Smith*.  But now, 39 years later and 28 years after the Supreme Court issued *Price Waterhouse*, our continuing refusal to recognize the significance of *Price Waterhouse* is not.

Our sister circuits' decisions are not correct.  Not one of the justifications they offer for concluding that Title VII does not protect a man or woman from discrimination because he is gay or she is a lesbian holds up to examination.

I begin by noting that several circuits have opined that discrimination against a man or woman because he or she is gay does not fall into any of the following categories of discrimination:  discrimination based on sexually charged interactions, on ascriptive stereotyping, or on differences in treatment between men and women.  But even if that is accurate,[16] discrimination doesn't have to comport with one of these theories in order to qualify under Title VII as discrimination "because of . . . sex."

Under *Price Waterhouse*, when an employer discriminates because of an employee's failure to conform to the employer's view of what a member of that sex should be, that employer has discriminated, in violation of Title VII, "because of . . . sex." *See Price Waterhouse*, 490 U.S. at 251.  That is all that is required to establish a claim for discrimination under Title VII.

Nor does it matter to the viability of an employee's claim that, as some courts have phrased it, "[s]exual orientation is not a classification that is protected under Title VII." *See*, *e.g.*, *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*,

---

[16] As I have noted, *see supra* at n.4, discrimination against a woman because she is sexually attracted to women can qualify as well as discrimination based on differences in treatment between men and women.  When an employer discriminates against a woman because she is sexually attracted to women but does not discriminate against a man because he is sexually attracted to women, the employer treats women and men differently "because of . . . sex."

224 F.3d 701, 707 (7th Cir. 2000); *see also Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 261 (3d Cir. 2001); *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996); *Vickers*, 453 F.3d at 762.   The concurrence relies on this rationale as well; as I have already explained, that reliance is grossly misplaced.

Some of our sister circuits, like the concurrence here, have also noted that "Congress has repeatedly rejected legislation that would have extended Title VII to cover sexual orientation." *Bibby*, 260 F.3d at 261.   But the Supreme Court has emphasized that "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.   Title VII prohibits 'discriminat[ion] . . . because of . . . sex' in the 'terms' or 'conditions' of employment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998).   This necessarily "extend[s] to [discrimination 'because of . . . sex'] of any kind that meets the statutory requirements." *Id.* at 80.   Indeed, the Court in *Oncale* made clear that we must apply Title VII's text alone, without regard to what we may divine Congress's concerns to be.   And *Price Waterhouse* establishes that discrimination based on an employee's failure to comport with the employer's view of what a member of the employee's sex should be is discrimination "because of . . . sex" that meets Title VII's statutory requirements.

It likewise makes no difference to the viability of a Title VII claim whether the employee has "readily demonstra[ted]" in the workplace the characteristic on which the discrimination is based. *Vickers*, 453 F.3d at 763. This argument is a variation on Judge Pryor's concurrence's contention that Title VII and *Price Waterhouse* somehow prohibit discrimination based on behavior only and not on being, so it fails for the same reasons that the concurrence does.

Finally, the panel opinion cites *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061 (9th Cir. 2002), for the proposition that "an employee's sexual orientation is irrelevant for purposes of Title VII." Maj. Op. at 16 (quotation marks omitted). In the context of *Rene*'s facts, I agree that the plaintiff's sexual orientation was irrelevant—but only because the plaintiff alleged that he was discriminated against "because of . . . sex" under Title VII when he was subjected to "severe, pervasive, and unwelcome 'physical conduct of a sexual nature' in the workplace." *Rene*, 305 F.3d at 1063.

As I have noted, discrimination that occurs in the form of physical sexual conduct satisfies a category of discrimination "because of . . . sex" without consideration of whether it also constitutes discrimination "because of . . . sex" under any other theories. But the mere fact that sexual orientation may be irrelevant when a plaintiff alleges discrimination "because of . . . sex" under Title VII based on an unwanted-sexual-conduct theory does not mean that it is irrelevant

when a plaintiff alleges discrimination "because of . . . sex" based on a prescriptive-stereotyping theory.

I am not the first person to conclude that discrimination against an employee because of her sexual orientation is discrimination against an employee "because of . . . sex."  In recent years in particular, numerous district courts, including two in our Circuit, have also reached this conclusion.  *See, e.g.*, *Winstead v. Lafayette Cty. Bd. of Cty. Comm'rs*, --- F. Supp. 3d ----, No. 1:16CV00054-MW-GRJ, 2016 WL 3440601, at *5-9 (N.D. Fla. June 20, 2016); *Isaacs v. Felder Servs., LLC*, 143 F. Supp. 3d 1190, 1193-94 (M.D. Ala. 2015); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1159-61 (C.D. Cal. 2015); *Deneffe v. SkyWest, Inc.*, No. 14-cv-00348-MEH, 2015 WL 2265373, at *5-6 (D. Colo. May 11, 2015); *Terveer v. Billington*, 34 F. Supp. 3d 100, 116 (D.D.C. 2014); *Boutillier v. Hartford Pub. Schs.*, No. 3:13CV1303 WWE, 2014 WL 4794527, at *2 (D. Conn. Sept. 25, 2014); *Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1224 (D. Or. 2002); *see also Christiansen v. Omnicom Grp., Inc.*, 167 F. Supp. 3d 598, 618-22 (S.D.N.Y. 2016) (adhering to circuit precedent foreclosing a sexual-orientation claim under Title VII but explaining why that precedent rests on shaky ground).

And the U.S. Equal Employment Opportunity Commission has taken the same position as these district courts, both in a recent administrative decision, *see*

54

*Baldwin v. Foxx*, EEOC Appeal No. 0120133080, 2015 WL 4397641 (July 15, 2015), and in this litigation in the capacity as an *amicus curiae*.  It is time that we as a court recognized that Title VII prohibits discrimination based on an employee's sexual orientation since that is discrimination "because of . . . sex."

## III.

Presidential-Medal-of-Freedom recipient Marlo Thomas has expressed the sentiment that "[i]n this land, every girl grows to be her own woman."[17]  Title VII codifies the promise that when she does, she will not be discriminated against on the job, regardless of whether she conforms to what her employer thinks a woman should be.  Because the panel does not read Title VII to fulfill that promise, I respectfully dissent.

---

[17] STEPHEN J. LAWRENCE & BRUCE HART, *Free to Be . . . You and Me*, *on* FREE TO BE . . . YOU AND ME (Bell Records 1972); *see also President Obama Announces the Presidential Medal of Freedom Recipients*, The White House, https://obamawhitehouse.archives.gov/blog/2014/11/10/president-obama-announces-presidential-medal-freedom-recipients (last visited Feb. 22, 2017).  Marlo Thomas and Friends created the album *Free to Be . . . You and Me*, a children's record with multiple songs, skits, stories, and poems, that has been praised for its "potent message of freedom, equality, and personal liberation."  *Free to Be . . . You and Me at 40*, The Paley Center for Media, https://www.paleycenter.org/2014-free-to-be-you-and-me-at-40 (last visited Feb. 19, 2017).  After the album went platinum, Thomas created a best-selling book and an award-winning television special of the same name.  *Id.*  Much of the album emphasizes the idea that a person should be what she wishes—not be forced to conform to another's view of her gender.  Some of the album's more famous songs that focus on this notion include "Parents are People," "William's Doll," and "It's Alright to Cry."  *Id.*  In addition to Thomas, Alan Alda, Harry Belafonte, Mel Brooks, Rita Coolidge, Billy DeWolfe, Roberta Flack, Rosey Grier, Michael Jackson, Kris Kristofferson, The New Seekers (who performed the title track), Tom Smothers, The Voices of East Harlem, and Dionne Warwick appear on the album.  *Free to Be You and Me*, Amazon, https://www.amazon.com/Free-Be-You-Marlo-Thomas/dp/B00005OKQT (last visited Feb. 20, 2017).  The White House cited Thomas's work on *Free to Be . . . You and Me* in its announcement of her Presidential Medal of Freedom.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

March 10, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-15234-BB
Case Style: Jameka Evans v. Georgia Regional Hospital, et al
District Court Docket No: 4:15-cv-00103-JRH-GRS

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Carol R. Lewis, BB at (404) 335-6179.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs